**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| *IN RE:* | § | NO.05-CA-11881 (PBS) |
| | § | |
| THE MATTER OF | § | |
| | § | |
| PERRY LEE WHATLEY | § | JURY TRIAL DEMANDED |

**MOTION TO MODIFY ORDER OF OCTOBER 11, 2005;**

**MOTION FOR A PRELIMINARY INJUNCTION PENDING A TRIAL ON THE MERITS WITH A TENTATIVE MOTION FOR STAY PENDING APPEAL**

TO THE HONORABLE JUDGE OF SAID COURT:

Come now, Dawn Johnson Whatley, joined by Perry Lee Whatley, and Daniel J. Shea who move this Court to modify the Order of October 11, 2005 which sanctions counsel, and upon consideration, to issue a preliminary injunction to preserve the status quo.  In the event  the Court should deny relief, Movants pray the Court stay the order as counsel will appeal the denial as expeditiously as the First Circuit will agree to hear it. In support they now show as follows:

I. INTRODUCTION

1.      Movants adopt and incorporate by reference as if set forth verbatim paragraphs 22 through 27 of their 1st Amended counterclaim filed on October 12th 2005 [Docket # 37], as part of this motion.

2.      Movants also  adopt and incorporate by reference as if set forth verbatim their *Emergency Application for Temporary Restraining Order, Ex-Parte* filed on September 19th, 2005 [Docket #4 ] as part of this motion.

3.      Movants also  adopt and incorporate by reference as if set forth verbatim their *Brief and Memorandum of Law on the Merits* filed in this case as part of this motion.

4.      The Court has suggested that it might consider recusal on independent grounds based

on its previous relationship with SWBSSI's expert, Dr. Friedman.   However, given now the Court's contacts with Defendant Wood, recusal is an issue that again merits some consideration before the Court proceeds any further.  Indeed, now that Wood is a party defendant, the substance of his *ex-parte* disclosures to this Judge are material to the Whatleys' conspiracy count and the appearance of partiality that Wood's telephone calls will continue to bring that now cloud the proceeding.[1]

5       As a matter of additional *ex-parte* contact that touches substantive law, the Whatleys annex  hereto as Exhibit "A" and duly incorporated herein by reference as if set forth verbatim the transcript of the hearing in state court on September 16, 2005.  It demonstrates that defendant Wood's *ex-parte* contact was strong enough to cause the Chartou-Merrill defendant to "ignore" and in effect, strike down 28 U.S.C. §1446 (d) and instead create a whole new and unconstitutional cause of action called "jurisdictional avoidance."  The action of these co-conspirators effectively overrules the U.S. Supreme Court's opinions in *Roe v. Saenz* and *Puerto Rico v. Branstad,* and judicially carves out a new exception to *Loving v. Virginia* to the effect that  the wife/spouse is no longer a factor in a marital relationship.  Apparently, whatever defendant Mike Wood wants, Mike Wood gets. And unfortunately, his ability to influence the state court bench now shrouds this case as well.

6.       The *ex-parte* contacts by the Wood defendant and the appearance of impropriety they raise could not have happened at a more critical constitutional juncture.  It is well settled law (at least to most judges and lawyers) that Art. VI, sec. 2, and Art. III of the United States Constitution stand for the proposition that when Federal and State law collide; Federal controls, and that once the U.S.

---

[1]  Counsel cannot assume that Mike Wood was extending an invitation to this Judge to attend the World Series in Houston if the beloved Boston Red Sox and the Houston Astros qualified. Other than that, it is Wood's policy to call other judges including Appellate Courts and give them his "take" on the merits of a case and his opinion of a party or a lawyer.  In the 5th Circuit, he has been strongly  rebuked for this conduct, and yet he persists on using  the telephone.  In this regard, this Court was previously alerted that Wood would come calling.

Supreme Court has spoken on an issue, that is the final word.  Perhaps these doctrines have not

trickled down to probate yet, but they have certainly withstood the test of time. [2]  Indeed, as this

Court has acknowledged on the record, the United States Supreme Court has granted certiorari on

the issue of federal court jurisdiction in probate matters and the case arises from the failure of a

probate judge to recognize the jurisdiction of the federal Court.  That probate judge was again, Mike

Wood.

## II. <u>FEDERAL COURTS</u>

7.    The seriousness of what is involved here cannot be overemphasized.  A federal judge

is not just a judge in the ordinary sense of the word; he or she is given a very special privilege and

power to carry out duties without fear of retribution, or campaign contributions that would color their

judgments.  Judge Harold R. De Moss of the Fifth Circuit accurately states why the federal judiciary

is what it is, and why it is to be viewed with such  respect. Judge De Moss writes:

> As Federal Judges we are extended two very special privileges of office. We are
> given lifetime appointments, and we are paid a salary which cannot be reduced.
> (U.S. Const., art. III, § 1).  We are given these special protections so that we may
> exercise our duties independently and impartially.   Otherwise, we would be
> vulnerable to political pressures that more directly impact the other branches of
> government, and our ability to enforce legal protections *in defense of individual
> liberties* would be undermined. This is at the core of our unique constitutional system
> of checks and balances.  Given the judicial independence that is fostered by lifetime
> appointments and irreducible salaries, we should not hesitate to provide a remedy
> [when law enforcement] exceeds the limits of its power.  Our power to decide cases
> is held in trust for the citizens of our great nation. We should not shirk our
> responsibility to decide hard legal questions.

*United States v. Brace*, 145 F.3d 247 (5th Cir. 1998)(emphasis added).

---

[2]    Movants appreciate the Court's honesty in disclosing that Mike Wood, as predicted in
Movants *Notice of Removal*, would use the telephone to co-opt this Court.  This is classic Mike
Wood, and defendant Chouteau-Merrill's failure to disclose it, and then her audacity in overruling
the 1st Circuit's *Sweeney* opinion, make her and Mike Wood kindred spirits in that Mike Wood
overrules not only the circuit courts of the United States, but when expedient, he overrules Congress,
the Texas Supreme Court, and in this case, the United States Supreme Court as well.

Examining that statement by Judge De Moss further, this Court will find that it is not just "lip service" that he pays to the service of this nation. In another controversial dissent, Judge De Moss wrote:

> I know the record in this case as well as any other Judge who has ever addressed it and better than most of the Judges on this Court. I wrote the panel opinion, see 237 F.3d 411, to provide a comprehensive overview of the history of this case because I was convinced that this is one of those special, unique and peculiar cases which demands a consideration of the totality of the circumstances in order to reach a just result. *I have laid awake nights agonizing over the enigmas, contradictions, and ambiguities which are inherent in this record.* However, my colleagues in the en banc majority have shut their eyes to the big picture and have persuaded themselves that piecemeal justice is sufficient in this case. That is, of course, their privilege – but I am glad I will not be standing in their shoes, if and when Soffar is executed solely because of the third statement he signed in this case.

*Soffar v. Cockrell*, 300 F.3d 588 (5th Cir. 2002)(emphasis added).[3]

8.      Given the liberty interests involved here, the Whatleys have the right to demand nothing less than the sentiments expressed by Judge De Moss. Thus, it is critical that no more *ex-parte* contacts with Defendants occur in this case, and that all of Mike Wood's communications be rebuffed and then disclosed in their entirety.

### III. MOTION CONCERNING THE OCTOBER 11TH ORDER

9.      In its order of October 11, 2005, the court denied relief with the *non sequitur* that "the removal was not made in good faith." In the context of the outcome, that means that this Court opines the removal was made in bad faith. This statement is a *sua sponte* sanction, denies counsel due process of law, and besmirches his abilities to uphold his oath as a lawyer and to serve his clients. Indeed, Federal case law (en banc) holds that an attorney's professional reputation is a

---

[3]  Because Judge De Moss displayed the courage to be a true Art. III Judge, Soffar was eventually freed from death row when the case was heard a third time. Had Judge De Moss simply "gone with the flow," Soffar would have been executed despite the constitutional infirmities in his case that everyone in the Texas Court system was willing to overlook. *See Soffar v. Dretke*, 368 F.3d 441 (5th Cir. 2004)

treasured possession, and that the Court should be careful before importing bad motives to a filing. *See Thomas v. Capital* 836 F.2d 866, 874 (5th Cir.1988) (en banc).

10.    The Federal Rules of Civil Procedure are designed to ensure the just, speedy, and inexpensive determination of civil claims in federal courts. FED. R. CIV. P. 1. One way the rules forward these goals is to impose a duty to base claims upon factually and legally supportable grounds and to punish litigants and lawyers who unreasonably pursue frivolous suits. Accordingly, the Rule in effect at the time of the proceedings at issue here provided in relevant part that:

> Every pleading, motion, and other paper of a party represented by an attorney shall be signed by at least one attorney of record. The signature of an attorney or party constitutes a certificate by the signer that the signer has read the pleading, motion, or other paper; that to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

Fed. R. Civ. P. 11. In applying this Rule, the question the Court should ask is whether the lawyer's certification complies with "an objective standard of reasonableness under the circumstances." *Smith v. Our Lady of the Lake Hosp., Inc.,* 960 F.2d 439, 444 (5th Cir.1992). The same Court has also stated that it ". . . has no desire to deter any litigant from advancing any claim or defense which is arguably supported by existing law, or any reasonably based suggestion for its extension, modification, or reversal. Positions thus taken cannot be considered as frivolous, although they may be unsuccessful *and indeed may be given short shrift.*" *Farguson v. Mbank Houston, N.A.,* 808 F.2d 358 (5th Cir. 1986)(emphasis added). Thus, when a Court imputes bad faith as a motive, it should allow the attorney to be heard before saddling him with such a finding. In fact, a finding of bad faith without hearing any evidence, or any hearing at all, is the way it is done in Mike Wood's court.

11.    Rule 11(c)(1)(B)'s requirement that a court imposing sanctions on its own initiative

describe the specific conduct that appears to be a violation and direct the alleged violator to show cause to the contrary, was intended to ensure due process. *Johnson v. Waddell & Reed, Inc.,* 74 F.3d 147 (7th Cir. 1996). "Giving an attorney only an after-the-fact opportunity to convince the court to set aside a rule violation it had already determined does not comply with either the letter or spirit of the rule." *Childs v. State Farm Mut. Auto. Ins. Co.*, 29 F.3d 1018, 1027 (5th Cir. 1994)(due process requires notice and an opportunity to be heard before sanctions are imposed).

12.    Here, the Court can be seen by a reasonable and disinterested observer to have concluded, after the Wood telephone call, that the removal was made in "bad faith." That appearance arises because when a court undertakes to reprimand an attorney for violating court rules, it is incumbent upon the court to observe scrupulously its own rules of disciplinary procedure. If the rules are inadequate, the court can proceed to amend them, but unless and until such amendment occurs, attorneys have the right to rely upon the rules. The threshold for the use of inherent power sanctions is high and counsel did nothing to merit this rebuke. As the Supreme Court explained, "[b]ecause inherent powers are shielded from direct democratic controls, they must be exercised with restraint and discretion." *Roadway Express, Inc. v. Piper,* 447 U.S. 752, 764 (1980)). Thus, counsel moves the Court to vacate the bad faith finding, and if the Court remains convinced that he acted in bad faith, then it can reinstate the finding after a hearing on the merits wherein not only will the law support what counsel did, but the facts will also bear out that any lawyer who undertakes his duty runs the risk of being broadsided by Mike Wood and his telephone calls. Counsel represents the elderly, a class that truly have no voice in the process, and counsel will not be threatened, intimated, or chased off from protecting his clients by Mike Wood.

IV.  <u>REQUEST FOR PRELIMINARY INJUNCTION</u>

13.    With respect to the hearing of September 29th 2005, in which Mike Wood claimed

that he "had it on good authority" that the removal triggered no duty on his part to obey Art VI. Sec 2, or 28 USC 1446 (d) – that hearing was held without service of process upon either Perry Lee or Dawn Johnson Whatley as required by law and cannot withstand the due process test. As the Supreme Court has stated in the past , "where a person has been deprived of property in a manner contrary to the most basic tenets of due process, it is no answer to say that in his particular case due process of law would have led to the same result because he had no adequate defense upon the merits." *Coe v. Armour Fertilizer Works,* 237 U.S. 413, 424 (1915). As the Court observed in *Armstrong v. Manzo,* only "wiping the slate clean would have restored the petitioner to the position he would have occupied had due process of law been accorded to him in the first place."[4] *Armstrong v. Manzo*, 85 S .Ct. 1187, 380 U.S. 545 (1965). Thus, the Court which arguably should have vacated the void state Court Orders, must now address them by injunction instead, as no federal law can allow an order rendered without notice as required by law to be carried into effect, especially when the litigants (all of them) are properly before this Court, and no other Court has jurisdiction of any of these parties or claims. Thus, the "ball" in now in the defendant's "court" to show that these are not the facts, and how a Probate Court in Texas without jurisdiction can overrule the Supreme Court, and order the forced repatriation of free citizen of the Commonwealth in violation of federal law. More importantly, the defendants will have to do so without Mike Wood

---

[4]  SWBSSI's new position is that defendant Wood is simply going to do it all over again anyway, so the void orders should be allowed to stand. Again, SWBSSI would do well in such a Court on a regular basis as the law is made up as they move along. Indeed, on October 13th 2005, O'Sullivan announced that Mike Wood without a hearing had "reappointed" a Temporary guardian by Order signed on even date, thus acknowledging that the Orders of September 29th 2005 were void ab initio by virtue of 28 USC 1446 (d). Again, the key words are " without notice or opportunity to be heard" by a citizen of the Commonwealth.

using the telephone to contact the judge hearing the case. [5]

14.    The following facts are not in dispute and weigh heavily in favor of injunctive relief:

A.    Mr. and Mrs. Whately are husband and wife;

B.    They were married in a Christian ceremony in Houston, Texas;

C.    No allegation of fraud in the marriage has been made in any Court;

D.    Mr. Whately, in the manner prescribed by law, expressly disqualified his niece and nephew from being his guardians in the event a situation like this arose;

E.    Mr. Whatley is a diabetic who was at Beth Israel Deaconess Hospital voluntarily receiving medical treatment;

F.    No Court of competent jurisdiction has declared Mr. Whately incompetent;

G.    SWBSSI brought a petition in State Court alleging elder abuse;

H.    When asked on the record on September 21st 2005 if it was still claiming elder abuse, SWBSSI said, "NO;"

I.    Perry Lee Whatley was not served with any Texas State Court process allowing him the right to be heard before he came to Boston;[6]

J.    Perry Lee Whatley was not served with notice that a hearing on a Temporary

---

[5]  Integrity matters here, and the Court should alert its staff to reject all ex-parte calls from Mike Wood or anyone acting on his behalf.

[6]  The Whatleys are now residents of the Commonwealth and it will be interesting to see how a Texas Probate Court can assert jurisdiction over them after they became citizens of the Commonwealth, but before [the] Texas process ever attached to them.  Hence, Chartou-Merrill's judicially created cause of action now known as "jurisdictional avoidance."  This cause of action, is of course, unknown in any of the 50 states, territories or U.S. Possessions. This is akin to a "Wood-Merrill" piece of " legislation" (the jurisdictional avoidance act of 2005) that no President or Governor would sign, and no federal judge could uphold as constitutional when challenged in light of *Roe v. Saenz*.

Guardian was going to held on September 29[7] 2005;[7]

K.    The Texas Probate case was removed to this Court on September 29th 2005, at least 5 hours before Mike Wood made the statement that *"I have it on good authority, that the removal is not binding on this Court."*

L.    Neither Perry Lee or Dawn Johnson Whatley have been indicted in Texas, and the Governor of Texas has made no demand for their return;

M.    As the Court opined, Perry Lee Whately is/ was receiving the finest medical care at the behest of his wife at Beth Israel Hospital, where he was not being mistreated and was not in any danger ;

N.    Since the rendition of this Court's last Order, Mr. Whatley has been relocated to Heathwood Nursing and Rehabilitation Center in Chestnut Hill, MA. The Center is operating under the void orders of Temporary Guardian Jimmy Walker. The Center is now hampered in its efforts to have Mr. Whatley's orthopedic problem corrected at New England Baptist. As of the date of this filing, Heathwood's physician, Dr. Badlissi of Urban Medical Group reports that and orthopedic consult will require transport to New England Baptist but that that has been disallowed by defendant Walker who has told the Center's social work team that Mr. Whatley's condition is "inoperable."[8]

O.    Counsel for SWBSSI states that he will "vociferously" object to any further treatment of Mr. Whatley in Massachusetts;

---

[7]He certainly was not served with notice that another guardianship hearing would be held on October 13th 2005, wherein he could at least object.

[8]Defendant Jimmy Walker is not a medical professional to be interfering with Mr. Whatley's medical treatment.

P.      Perry Lee Whatley is now being subjected to "elder abuse" at the hands of

defendants SWBSSI and Walker as defined at Mass. Gen. Law ch. 19A;

Q.      This court's asset freeze Order is sufficient to protect the greed and

"interests" of the niece and nephew.[9]

15.    For purposes of their analysis of the need for injunctive relief, the Whatleys reiterate

their adoption and incorporation by reference as if set forth verbatim their *Emergency Application*

*for Temporary Restraining Order* filed in this case and reiterated in part below.  They also reiterate

their adoption and incorporation by reference as if set forth verbatim their *Brief and Memorandum*

*of Law on the Merits* reiterated in part below.

16.    It has long been a settled principle that federal courts may enjoin unconstitutional

action by state officials.  *Ex parte Young,* 209 U.S. 123, 155-156 (1908).  Here, and as reaffirmed

by the United States Supreme Court, no judicial officer can command the extradition of a citizen;

it is an executive act and function, and the executive branch has made no such demand to the

Commonwealth that would trigger a State Court Judge to act in violation of Art VI. Sec 2, and 28

U.S.C. § 1446(d).  Accordingly, this Court has the authority to enjoin any state official from

interfering with its jurisdiction, and by judicial fiat, anyone acting in concert and scheme with said

state officials.

17.    In *Puerto Rico v. Branstad*, 107 S. Ct. 2802, 483 U.S. 219 (U.S. 1987), the United

States Supreme Court held that only with a Governor's warrant, properly executed by both

---

[9] Mr. O'Sullivan has repeatedly stated to this Court that Ms. Norman has $ 500.000.00 that
was converted by Dawn Johnson Whatley in her trust account. This statement is FALSE. No such
conversion has occurred, and will not occur in light of this Court's orders.

sovereigns, can a fugitive from one jurisdiction be forcibly removed to demanding a state.[10]  Again, Perry Lee Whatley is not a fugitive from justice, there is no Governor's warrant served upon the Commonwealth, and this Court's Art. III jurisdiction has been properly invoked.  Thus, this Court, and this Court only, can determine this issue which, by the actions and the ruse of these defendants has created a constitutional crisis of the first order.

18.    Perry Lee and Dawn Johnson Whatley's rights to travel, stay, reside in another state, and invoke the jurisdiction of this Court are being threatened by judicial tyranny and lawyerly contrivance.  In *Saenz v. Roe*, 526 U.S. 489, 119 S. Ct. 1518, 143 L. Ed.2d 689 (U.S.1999), the United States Supreme Court again reaffirmed that the right to travel embraces three different components: the right to enter and leave another State; the right to be treated as a welcome visitor while temporarily present in another State; and, for those travelers who elect to become permanent residents, the right to be treated like other citizens of that State.  In *Saenz*, the Supreme Court also held that the right of newly arrived citizens to the same privileges and immunities enjoyed by other citizens of their new State, i.e, the third aspect of the right to travel, is protected by the new arrival's status as both a state citizen and a United States citizen, and it is plainly identified in the Fourteenth Amendment's Privileges or Immunities Clause; *see Slaughter-House Cases*, 16 Wall. 36, 80.  The

---

[10]    *See* Extradition Clause and the Extradition Act.  "Whenever the executive authority of any State or Territory demands any person as a fugitive from justice, of the executive authority of any State, District or Territory to which such person has fled, and produces a copy of an indictment found or an affidavit made before a magistrate of any State or Territory, charging the person demanded with having committed treason, felony, or other crime, certified as authentic by the governor or chief magistrate of the State or Territory from whence the person so charged has fled, the executive authority of the State, District or Territory to which such person has fled shall cause him to be arrested and secured, and notify the executive authority making such demand, or the agent of such authority appointed to receive the fugitive, and shall cause the fugitive to be delivered to such agent when he shall appear. If no such agent appears within thirty days from the time of the arrest, the prisoner may be discharged." 18 U.S.C. § 3182.  The statute has remained substantially unchanged since its original enactment in the Extradition Act of 1793, 1 Stat. 302.  *See also* 18 U.S.C. § 662 (1940 ed.); Rev. Stat. § 5278.

Court further held that newly arrived citizens have both state and federal rights  -- rights which the Whatleys have by coming into this Court, which adds special force to their claim that they have the same rights as others who share their citizenship.  Thus, since the right to travel embraces a citizen's right to be treated equally in her or his new State of residence, a discriminatory classification, such as the one rendered by the Massachusetts State Judge, is itself a penalty. The Fourteenth Amendment's Citizenship Clause expressly equates citizenship with residence, [*Saenz, citing Zobel*, 457 U. S., at 69] and does not tolerate a hierarchy of subclasses of similarly situated citizens based on the location of their prior residences.

19.     The Supreme Court has consistently held that Congress may not authorize the States to violate the Fourteenth Amendment.  Moreover, the protection afforded to a citizen by that Amendment's Citizenship Clause limits the powers of the National Government as well as the States. Congress's Article I powers to legislate are limited not only by the scope of the Framers' affirmative delegation, but also by the principle that the powers may not be exercised in a way that violates other specific provisions of the Constitution. *See Williams v. Rhodes*, 393 U. S. 23, 29 (1968).

20.     Thus,  the new cause of action of "jurisdictional avoidance" that SWBSSI pled, and Chartou-Merrill judicially created, cannot withstand a preliminary injunction.

21.     By way of their amended §1983 counter-claim, the Whatleys seek the protection that the Constitution guarantees them under the First, Fifth, and Fourteenth Amendments to the United States Constitution. The affected constitutional guarantees are as follows:

A.     Their right to travel and enter and leave any state of the union.  In *Roe v. Saenz*, the United States Supreme Court made clear that the State and their agencies cannot use the state court system to undermine that right, yet, this is what SWBSSI has done here;

B.     Their right to be free from judicial extradition. This is a right that the United States Supreme Court recognized in *Puerto Rico v. Branstad*. The executive branch requests extraditions, not the judicial branch. Again, SWBSSI has accomplished this act by using the State Court system, something that the Supreme Court has disallowed. (Judge Gorton vacated this state court order).

C.     The right to marital privacy. *Loving v. Virginia*; and

D.     The right to practice their religious beliefs and make their own life and death decisions – including medical care.

22.     The Counter-defendant/co-conspirators have interfered with all these rights by acting as agents for the niece and nephew at the behest of the state court system.

23.     The protection of these constitutional guarantees is the *only Preliminary Injunctive Relief being sought*, and SWBSSI may not avoid the power of this Court to protect all these guarantees. That is well settled law. In *Wyatt v. Cole,* 504 U.S. 158, 112 S. Ct. 1827, 118 L. Ed. 2d 504 (1992), the United States Supreme Court held that anyone who uses the State Court process to deprive another of a right secured under the Federal Constitution is not entitled to immunity from suit, even though the public officials involved (state court judges) may have judicial immunity. Stated differently, even if every state court judge acted corruptly or maliciously with subject matter jurisdiction, this will not insulate the private party that used the State Court to effect the deprivation. The Court held that "title 42 U.S.C. § 1983 provides a cause of action against every person who, under color of any statute of any state subjects, or causes to be subjected, any citizen to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws of the United States ." *Id.* "The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims

-13-

if such deterrence fails." *Id., citing Carey v. Piphus*, 435 U.S. 247, 254-257 (1978). Previously, in

*Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982), the Court had considered the scope of § 1983

liability in the context of garnishment, prejudgment attachment, and replevin statutes. In that case,

the Court held that private parties who attached a debtor's assets pursuant to a state attachment

statute were subject to § 1983 liability if the statute was constitutionally infirm. Noting that

"garnishment, prejudgment attachment, and replevin cases established that private use of state laws

to secure property could constitute state action for purposes of the Fourteenth Amendment, " (*id.*,

at 932-935), the Court held that "private defendants invoking a state-created attachment statute act

under color of state law within the meaning of § 1983 if their actions are fairly attributable to the

State." *Id.*, at 937. This requirement is satisfied, the Court held, if two conditions are met. First,

"the deprivation must be caused by the exercise of some right or privilege created by the State or by

a rule of conduct imposed by the State or by a person for whom the State is responsible." *Id.*

Second, "the private party must have acted together with or . . . obtained significant aid from state

officials" or engaged in conduct otherwise chargeable to the State." *Id.* Significantly, the Court

found § 1983 liability in *Lugar* because "the attachment scheme was created by the State and

because the private defendants, in invoking the aid of state officials to attach the disputed property,

were willful participants in joint activity with the State or its agents."[11] *Id.*, at 941 (internal quotation

marks omitted). Attachment, of course, is precisely one of the things engineered here by SWBSSI.

24.    In *Wyatt*, the District Court below, citing *Lugar*, had assumed that Cole, by invoking

the state statute, had acted under color of state law within the meaning of § 1983, and was therefore

---

[11] Exactly what SWBSSI has done here. They used the Massachusetts state court to imprison a Texas Citizen, hold him against his will, and then slap Texas Process on him in favor of the private litigants, and then attempted to extradite him against his will at the request of the private litigants. The record is very clear on all these facts.

liable for damages for the deprivation of Wyatt's due process rights.  With respect to the attorney involved (Robbins), the court noted that while an action taken by an attorney in representing a client does not normally constitute an act under color of state law . . . an attorney is still a person who may conspire to act under color of state law in depriving another of secured rights." *Id.*, at 13.  The District Court did not determine whether Robbins was liable, however, because it held that both Cole and Robbins were entitled to qualified immunity from suit at least for conduct prior to the statute's invalidation. *Id.*, at 13-14.  However, the Supreme Court in *Wyatt* extended the reach of *Lugar beyond qualified immunity*.  The *Wyatt* Court reversed the Fifth Circuit that had affirmed the district court and held that no private party is entitled to *any* immunity (qualified or otherwise) for mis-using the State Court process, identical in nature to what SWBSSI has done here. Thus, this Court has jurisdiction over the Whatley's 1983 claims, should grant them temporary relief, and those claims are straight forward and simple to discern.

> a. It cannot force the Whatley's to leave the Commonwealth against their wishes at the behest of SWBSSI;
>
> b. It cannot allow SWBSSI to use the Massachusetts State Court to force extraditions, act as process servers, or appoint Ad-Litems in Massachusetts, when Mr. Whatley's wishes are clear, and are a fundamental tenant of his faith; and,
>
> c. It can enjoin SWBSSI from violating the Movants constitutional rights, cognizable under Sec 1983 since Movants have made a prima facie showing of probable success on the merits.

## V.  TENTATIVE REQUEST FOR STAY PENDING APPEAL

25.    The First Circuit's criteria for a stay pending appeal is a straightforward and simple one. "If the denial of a stay will utterly destroy the status quo, irreparably harming appellants, but

the granting of a stay will cause relatively slight harm to appellee; appellants need not show an absolute probability of success in order to be entitled to a stay." *Providence Journal Co. v. Federal Bureau of Investigation*, 595 F.2d 889 (1st Cir. 1979). *See* FED. R. APP. P. 4 (a) (2) (4) (b).[12] Unless the defendants can show that the Whatleys are incorrect about the facts that are set forth in the application as being the facts of this case, the law will speak for itself. And if this Court can enjoin Wood and keep him off the telephone with the Court, then the Whatleys will prevail on all issues, as the law is well settled. The burden is on the Whatleys to meet the criteria in Rule 65, of which they have made a prima facie showing. Thus, the burden now shifts to the defendants as to why the Orders of this Court already in place should not be extended, and why this injunction should not be granted. However, the Whatleys should not be required to defend against defendant Wood's telephone calls, and thus they ask the Court to enjoin Wood from continuing this practice as it does not impinge of any of his constitutional rights as a defendant in this case.

## VII. CONCLUSION AND REQUEST FOR RELIEF

26.     What Mike Wood and E. Chartou-Merrill have agreed to do is criminal, and violates the civil rights of the Whatleys.[13] The Whatleys are married, they have no temporary guardians legally appointed (a fact ethos concedes), no criminal warrants commanding their extradition, and have moved here freely and voluntarily. They committed no crime, and they bothered no one. Their only "crime" is that they have an estate that Mike Wood believes he can carve up to take care of his

---

[12] Premature notice of appeal becomes effective at the moment the Court announces its ruling and enters it. Thus, the notice may become moot if relief is granted, or go active if relief is denied.

[13] At the hearing on this application, Movants will present irrefutable proof that Mike Wood on September 29th 2005, in Houston, Texas, agreed with Chartou-Merrill, that Merrill had no jurisdiction, but that Merrill was to order local law enforcement to take Mr. Whatley to the airport despite the orders of this Court that he be kept in the Commonwealth.

friends and campaign contributors, as he has done over and over again.  *See* Exhibit "B" attached hereto and duly incorporated herein by reference. [14] The Orders entered by Mike Wood and E. Chartou-Merrill without subject matter jurisdiction are void and the Whatleys are entitled to be protected from them.  Further, because the Court has entered a "bad faith" finding after being contacted by defendant Wood, it should vacate that finding and set a separate hearing to afford counsel due process of law.[15]   In all other respects, the Court should issue the injunction to maintain the status quo pending a trial on the merits, as follows:

> a.    Enjoin the Counterdefendant/Co-Conspirators and anyone acting in concert and scheme from forcing the Whatleys' extradition from the Commonwealth; *See: Puerto Rico v. Branstad*,
>
> b.    Enjoin the Counterdefendant/Co-Conspirators and anyone acting in concert and scheme from restraining the Whatley's ability to travel and to receive medical treatment while in this Court's jurisdiction; *See: Roe v. Saenz*,
>
> c.    Enjoin Mike Wood or anyone acting on his behalf from contacting this Court ex-parte, as he will have ample opportunity to plead his case when he files his motions to dismiss claiming whatever defenses he may raise;
>
> d.    Enjoin Jimmy Walker from interfering with the medical treatment that the professionals may order, and enjoin Walker from seizing assets as the assets are already protected by Order of this Court;

---

[14] This is but one example of what defendant Wood does with a  straight face while on the telephone.

[15] In hindsight, the Court should have never taken the call as it has now cast a shadow over the entire proceeding.  Understandably, it trusted a Judge, and the Whatleys take no offense at Her Honor being compromised in the hope that it will not happen again.

e.    Enjoin under the all writs act any further filings of any other lawsuits in any

other jurisdictions that touch on the issues in this case, or the any of the

named parties.

Respectfully submitted,                          Respectfully submitted,

PERRY LEE WHATLEY,                          DAWN JOHNSON WHATLEY,


By:/s/ ECF                                        /s/ ECF
    SUSAN C. NORMAN                          DANIEL J. SHEA
    Texas Bar No. 15083020                    Mass. B.B.O. # 652896
    LAW OFFICE OF SUSAN C. NORMAN         DANIEL J. SHEA, P.C.
    9135 Katy Fwy., Suite 100                1928 West Bell Street
    Houston, TX 77024                        Houston, TX 77019-4814
    (713) 465-3344                           (713) 942-7500
    (713) 468-6243 Telecopier                (713) 942-7507 Telecopier
    *PRO HAC VICE* (PENDING)

## CERTIFICATE OF SERVICE

This is to certify that the above and foregoing *Motion to Modify Order of October 11, 2005;*
*Motion for a Preliminary Injunction Pending a Trial on the Merits With a Tentative Motion for Stay*
*Pending Appeal* was served pursuant to FED. R. CIV. P. 5 on the 14th day of October 2005 to the
individuals and in the manner indicated below:

    Mr. James M. O'Sullivan                     U.S. Mail, First Class
    O'SULLIVAN & ASSOCIATES, P.C.
    17 Accord Park Drive, Suite 104
    Norwell, MA 02061-0000
    ATTORNEY FOR SOUTHWEST
    BOSTON SENIOR SERVICES, INC.



                              /s/ DANIEL J. SHEA (ECF)

# COMMONWEALTH OF MASSACHUSETTS

# TRIAL COURT OF MASSACHUSETTS

# PROBATE AND FAMILY COURT DEPARTMENT

## DOCKET NO. 05-P-2003

## IN RE: THE MATTER OF PERRY LEE WHATLEY

Transcribed from taped proceedings.



**Legal Resources Group**

701 N. Post Oak Road, Suite 425                Phone: (713) 554-0080

Houston, Texas 77024                            Fax: (713) 554-0085

Page 1

```
 1              THE COURT:  In the matter of Perry Lee

 2    Whatley, 05-P-2003.

 3              May I have each person's name, please.

 4              MR. O'SULLIVAN:  James O'Sullivan,

 5    representing the Petitioner, Southwest Boston Senior

 6    Services, Inc.

 7              MR. SHEA:  Daniel Shea, representing

 8    Dawn Johnson Whatley.

 9              MR. RODRIGUEZ:  George Rodriguez,

10    court-appointed guardian ad litem.

11              MR. SHEA:  And for purposes here today,

12    Judge, I'm also here on behalf of the attorney for

13    Perry Lee Whatley --

14              THE COURT:  Uh-huh.

15              MR. SHEA:  -- who's not here at the

16    moment because of the Notice of Removal.

17              THE COURT:  Okay.

18              MR. O'SULLIVAN:  Your Honor, I object to

19    any reference to Mr. Whatley's counsel because it's

20    our position he doesn't have the capacity to retain

21    counsel.

22              THE COURT:  All right.  And

23    Mr. Rodriguez, you are the guardian ad litem.  Okay.

24    All right.  Come right up.

25              What authority is there to remove this
```

Page 2

```
 1   case to Federal court?

 2              MR. SHEA:  Is that a question directed

 3   at the -- at the party?

 4              THE COURT:  Yes.

 5              MR. SHEA:  Judge, that's the question

 6   that the Federal judge -- the Federal judge is now

 7   going to have to answer.

 8              THE COURT:  I think that I'm entitled to

 9   an answer as well.

10              MR. SHEA:  Well, the notice --

11              THE COURT:  The cause of action, which

12   is elder abuse, is a state cause of action.

13              MR. SHEA:  I realize that, Judge, but

14   also on file in the Federal court is now the

15   Defendant's original answer in a counter-claim under

16   42 United States Code 1983.

17              So the matter in the Federal court has

18   to do with the 14th Amendment, marital property, and

19   it's a civil rights matter.

20              Also, Your Honor, we invoke the Federal

21   court's jurisdiction based upon diversity.  Mr. and

22   Mrs. Whatley are citizens of Texas and the diversity

23   of jurisdiction appears on the face of the pleadings

24   in this court.

25              THE COURT:  Well, the In Personam
```

Page 3

```
 1    jurisdiction is here because Mr. Whatley is here; and
 2    the cause of action, which was alleged elder abuse,
 3    was certainly brought here based on facts brought to
 4    the attention of this court.
 5              So it seems to me that this seems like
 6    an end run-around trying to have this court hear the
 7    case on the merits.
 8              Mr. O'Sullivan, do you have any position
 9    on this?
10              MR. O'SULLIVAN:  Your Honor, I was just
11    handed these documents right now.  I haven't had a
12    chance to do any research.
13              THE COURT:  Okay.
14              MR. O'SULLIVAN:  This is a new
15    experience to me, even though I've been doing this
16    for 20 years.
17              But it was brought into the Federal
18    district court in this manner.  It is now touched by
19    seven district courts, to my knowledge.
20              Mr. Shea has also admitted it down in
21    Texas.  He tried to have the temporary guardianship
22    proceedings in Texas removed to the Federal district
23    court in Texas.  The Federal district court
24    apparently remanded that case.  He's appealed that to
25    the U.S. Circuit Court of Appeals.
```

Page 4

```
 1                 He's attempted to recuse two probate

 2     court justices in the State of Texas; and when he was

 3     unsuccessful there, he appealed those orders to the

 4     Texas Court of Appeals.  And in addition, he sued the

 5     judge and the parties and the court-appointed

 6     attorneys in the Texas district court as another way

 7     of avoiding the jurisdiction of the Texas courts.

 8                 My concern, Your Honor, is for

 9     Mr. Whatley.

10                 THE COURT:  Uh-huh.

11                 MR. O'SULLIVAN:  There are proceedings

12     in Texas that should be resolved.  There is a hearing

13     scheduled on Thursday, to the best of my knowledge,

14     to determine whether he is appointed a temporary

15     guardian.

16                 I think that Mr. -- if Mr. Shea is not

17     willing to have Mr. Whatley return to Texas

18     immediately, there should be some kind of order that

19     at least he remain in Massachusetts until Texas can

20     resolve the matter.

21                 THE COURT:  Okay.  All right.

22     Mr. Rodriguez, what did you find out?

23                 MR. RODRIGUEZ:  Your Honor, I spoke with

24     the -- with a number of people, but today, I spoke

25     with the probate court guardianship --
```

Page 5

```
 1                    MR. SHEA:  But, Your Honor, I must --
 2      are we making a record?  I apologize.
 3                    THE COURT:  There's a record.
 4                    MR. SHEA:  I must -- I must object to
 5      the taping of any testimony at this pace -- at this
 6      point because pursuant to the First Circuit in the
 7      Sweeney matter, which we cite in the Notice of
 8      Removal, this court's jurisdiction absolutely ceases
 9      as of the filing of the Notice of Removal in Federal
10      court.
11                    THE COURT:  I'm not recognizing that.
12      You can take it up on appeal.
13                    Mr. Rodriguez, what did you find out?
14                    MR. RODRIGUEZ:  Yes, Your Honor.
15      According to the guardianship clerk that I spoke with
16      today, they were attempting to get hold of the judge
17      to have him contact this jurisdiction.
18                    There have been numerous motions to
19      recuse filed as well as motions regarding the Federal
20      court procedure.
21                    They did fax me copies of several of the
22      latest orders, one being the order scheduling the
23      matter for temporary guardianship hearing on
24      September 22nd at 2:00 p.m.; a copy of the order
25      denying the Motion to Recuse and an order to show
```

Page 6

1    cause on -- for Attorney Susan Norman, who has -- it

2    is my understanding has stated to the court in Texas

3    that she is the private counsel for Mr. Whatley.  He

4    does have a court-appointed counsel.

5            The court ordered Attorney Norman to

6    produce Mr. Whatley.  On the date that that was to

7    happen, neither Attorney Norman nor Mr. Whatley were

8    produced or present in the courtroom, and the matter

9    was sent down for a show cause hearing on the 13th.

10   I'm not fully aware of what happened on the 13th, THE

11   COURT.

12           This guardianship petition in Texas

13   started in April.  I have spoken with the

14   court-appointed counsel down there as well as

15   reviewed some of the records up here.

16           Your Honor, there have been two

17   evaluations, the initial evaluation plus an

18   independent evaluation by the court-appointed

19   clinician down in Texas, both of whom indicate that

20   Mr. Whatley is in need of guardianship proceedings.

21           There have been numerous attempts to

22   have hearings held, but they have not been able to

23   maintain service -- get service because of not being

24   kept informed as to Mr. Whatley's location.

25           It's my understanding that on the 12th

Page 7

```
 1    the parties were put under oath and questioned about

 2    Mr. Whatley's location and the answers were that no

 3    one knew where he was; meanwhile, he was at the

 4    hospital.

 5              THE COURT:  Uh-huh.

 6              MR. RODRIGUEZ:  There was a referral to

 7    elder service -- it's protected services on --

 8              THE COURT:  At the hospital in Texas or

 9    at the hospital here?

10              MR. RODRIGUEZ:  He was at the hospital

11    in Texas.  Elder service -- there was an at-risk

12    patient petition and call made.  They did an

13    investigation.  They went to the home.  They were not

14    able to locate him.

15              They started calling various hospitals,

16    did locate him, obtained an emergency order out of

17    the probate court basically placing Mr. Whatley in

18    their custody.

19              By the time they got to the hospital,

20    Mr. Whatley had been checked out of the hospital

21    A.M.A. and was being brought to Boston.

22              The records from the hospital show that

23    this was a physician-to-physician referral for an

24    inpatient-to-inpatient referral, that Mr. Whatley was

25    in need of further treatment for his diabetes, which
```

Page 8

```
 1    is uncontrolled and for foot ulcerations.

 2              It turns out that's not exactly the way

 3    that it happened because he had been checked out

 4    A.M.A, so it wasn't that facility calling this

 5    facility.  It was another doctor, the doctor whose

 6    affidavit has been provided, Dr. Agris, I think it

 7    is, who apparently --

 8              THE COURT:  Dr. Vegas?

 9              MR. RODRIGUEZ:  I don't want to

10    mispronounce it.

11              MR. O'SULLIVAN:  Agris, A-G-R-I-S.

12              MR. RODRIGUEZ:  According to the

13    affidavit he filed with the Texas courts, he took

14    over case management from Mr. Whatley's case in July

15    of '05; however, he was not the attending physician

16    at the facility that Mr. Whatley was at prior to

17    coming to Massachusetts.

18              Since coming -- Mr. Whatley was brought

19    to the hospital -- my understanding is directly from

20    the airport accompanied by Attorney Shea and by Dawn

21    Whatley and was admitted onto the unit.

22              He has not required basically any

23    intervention since he's been here.  The hospital's

24    contention is that he does not need hospital level of

25    care.
```

Page 9

```
 1                    They have done very little in terms of

 2    treatment.  The doctor told me that he -- basically

 3    they adjusted the timing and minor adjustment in the

 4    dose of the insulin that he's receiving.  They had

 5    the foot ulcerations looked at.  They were not

 6    infected and didn't require any additional care.

 7                    There was a PT evaluation done today to

 8    see whether or not he would be appropriate to

 9    discharge to a rehab facility.

10                    And based on the information obtained,

11    largely from Dawn Whatley, but also from the clinical

12    sense of the PT evaluator, Mr. Whatley hasn't really

13    walked or been out of bed in four months.  There's

14    24-hour home care and a Hoyer lift that gets him

15    around.  So it's their determination that there's

16    really nothing that a rehab could do for him up to

17    this point in time.

18                    They also administered some tests which

19    indicated that -- that Mr. Whatley's blood sugars

20    have basically been in control for approximately

21    three months.

22                    They did say that it's possible to have

23    some spikes in there, given certain circumstances but

24    the test that is designed to look at how things are

25    going overall for about a three-month period and that
```

Page 10

1   he does six on that test, which indicates that his

2   blood sugars are under control and being managed as

3   is without additional interventions.

4              There are numerous allegations in Texas

5   between the two sides, Your Honor. I take no

6   position on who is putting forward what.

7              It does seem that there has been a great

8   deal done to avoid having Mr. Whatley brought before

9   the probate court in Texas. And at this point in

10  time that's where this matter belongs.

11             And he (inaudible) before that -- they

12  have all the information. The parties are all there.

13  The witnesses are all there, and that's what should

14  happen at this time.

15             MR. SHEA: May I respond, Your Honor?

16             THE COURT: Yes.

17             MR. SHEA: And if I might approach.

18  First of all, without waiver of right to appeal this

19  matter, pursuant to the Sweeney case, which is cited

20  in the Notice of Removal -- and I need to put that in

21  the record, if you don't mind.

22             THE COURT: Uh-huh.

23             MR. SHEA: That case is cited at 16 Fed

24  3rd, Page 1, authored at the time by Justice Pryor

25  citing the United States Supreme Court precedent on

Page 11

```
 1    the matter of removal and the fact that this court is

 2    not operating with absolutely no jurisdiction.

 3                  THE COURT:  Well, Mr. Shea, are you even

 4    admitted in Massachusetts?

 5                  MR. SHEA:  Yes, I am, ma'am.

 6                  THE COURT:  All right.  Okay.

 7                  MR. SHEA:  May I approach?

 8                  THE COURT:  Go ahead.

 9                  MR. SHEA:  And without waiver of any of

10    those rights to appeal, if Your Honor does elect to

11    proceed in the face of the Sweeney case, I believe at

12    the very least you should have the affidavit in the

13    Agris case to which counsel has referred.  May we

14    have this marked?

15                  MR. O'SULLIVAN:  I've seen it, Your

16    Honor.

17                  THE COURT:  Thank You.  Yes.  Okay.

18    I've read it.

19                  MR. SHEA:  Judge, may I remain seated

20    for just a moment?

21                  THE COURT:  Yes.

22                  Actually, Mr. Rodriguez, did you have a

23    chance to meet with Mr. Whatley?

24                  MR. RODRIGUEZ:  I did briefly, Your

25    Honor, yesterday about 5:00 o'clock or so.  I
```

IN THE MATTER OF PERRY H. FLYNN FRY

Page 12

1    introduced myself to him, explained that I was a

2    lawyer who had been sent out by the court to look

3    into things. I just -- (inaudible) there had been a

4    number of things that I just happened including the

5    process service, so I kept it pretty basic. I asked

6    him how he was doing, how he felt and where he wanted

7    to go when he left the hospital. I pretty much left

8    it at that.

9              THE COURT:  How -- what was his

10   response?

11             MR. RODRIGUEZ:  That he was feeling

12   okay. He didn't feel that he was ready to leave the

13   hospital yet, that when he was ready to leave the

14   hospital, he wanted to go home and --

15             THE COURT:  What is home, as far as he's

16   concerned?

17             MR. RODRIGUEZ:  He indicated home with

18   his wife, Your Honor.

19             THE COURT:  But he didn't --

20             MR. RODRIGUEZ:  I didn't ask him for a

21   state or address or anything. The process server had

22   been there a little bit before that, and my

23   understanding from -- there was a little bit of a

24   scene there. So I was really was trying to be

25   minimally intrusive at that point.

Page 13

```
 1              I did speak to the doctor about whether
 2   he had any impressions about what Mr. Whatley was
 3   understanding and not understanding.  And he stated
 4   that Mr. Whatley did not remember him from one day to
 5   the next, that he did appear to know where he was
 6   from and was able to follow basic orders.
 7              THE COURT:  So you didn't really get any
 8   impression at all about his competence or his
 9   understanding of what's going on?
10              MR. RODRIGUEZ:  Not really, Your Honor.
11   Mrs. Whatley was in the process of faxing something
12   and I knew she would be coming back into the room.
13   And given the facts of what had just happened, I was
14   trying to actually leave prior to anything else
15   upsetting Mr. Whatley.
16              I'll be happy to go back if the Court
17   wants me to do that.
18              MR. SHEA:  Your Honor, may I approach
19   the Court?
20              THE COURT:  Yes, go ahead, Mr. Shea.
21              MR. SHEA:  Your Honor, let the record
22   reflect that I'm filing an notice of emergency appeal
23   to the United States Court of Appeals.
24              THE COURT:  This isn't the -- this isn't
25   the -- you can't file that here.  This is not the
```

Page 14

```
 1    United States First Circuit Court of Appeals.
 2                MR. SHEA:  Nevertheless, I'd like to
 3    reflect that I'm going to file (inaudible).
 4                THE COURT:  This is not the right place,
 5    sir.
 6                MR. SHEA:  Well, I appreciate the
 7    Court's position, Judge, but I nevertheless need to
 8    file in the record (inaudible).
 9                THE COURT:  You may file it, but it has
10    no purpose whatsoever in this case.  This is not the
11    proper place for it.
12                MR. SHEA:  Thank you, Your Honor.
13                THE COURT:  All right.  Go ahead.  I'm
14    waiting to hear from you.  Mr. Shea, I'm waiting.
15                MR. SHEA:  I'm sorry.  Your Honor,
16    the -- any factual matters pertaining to the care of
17    Mr. Whatley are set forth in some detail by the
18    affidavit of Dr. Joseph Agris, which the Court
19    apparently has read.  I'm not competent to testify to
20    any matters other than what physicians may or may not
21    say.
22                I believe that the Agris affidavit has
23    been entered.  May we admit it into evidence, please?
24                THE COURT:  It is admitted, Exhibit 1.
25                MR. SHEA:  Is it marked by Your Honor?
```

Page 15

```
 1                THE COURT:  Yes.  Go ahead.

 2                MR. SHEA:  That's all that we have.  We

 3     continue to take the position that this court has

 4     absolutely -- or if I might respectfully read from

 5     the opinion.  The -- since the language is relatively

 6     strong, and that is the First Circuit has held that

 7     at the point that a Notice of Removal is filed in a

 8     Federal court, the First Circuit rights, quote,

 9     double quote -- indicating that they're citing higher

10     authority.

11                THE COURT:  Uh-huh.

12                MR. SHEA:  At that point, the

13     jurisdiction of the State court, internal quote,

14     absolutely ceased in that of the Federal court

15     immediately attached, closed internal quote, twice.

16     There they're, referring to the case of Hyde Park

17     Partners, LP versus Connolly, which is a -- which is

18     cited at 839 Fed 2nd, 837, a First Circuit case in

19     1988.

20                In the Hyde Park case, quotes, the case

21     of Steamship Company versus Tugman, a United States

22     Supreme Court case cited at 106 U.S. 118, 1882.  In

23     the entire Sweeney case -- again, the cite on that is

24     16 Fed 3rd, 1, authored by Justice Bryer and Judges

25     Selya and Cyr.
```

Page 16

```
 1                  So consequently, it is Dawn Johnson
 2    Whatley's position, respectfully, that based upon the
 3    law, this court has absolutely -- and that's the -- I
 4    use the word "absolutely" citing to the case in the
 5    First Circuit court -- has absolutely no
 6    jurisdiction.  And indeed, under the case law, the
 7    court has a duty to proceed no further.
 8                  Again, that's -- the word "duty" is the
 9    First Circuit's choice of language.  I certainly
10    would have to agree with that.
11                  That's the -- that's Dawn Johnson
12    Whatley's position and that's the reason that we have
13    filed in the case file the Notice of Emergency Appeal
14    to the First Circuit.
15                  THE COURT:  Anything else?
16                  MR. SHEA:  Nothing further.
17                  THE COURT:  Mr. O'Sullivan?
18                  MR. O'SULLIVAN:  Your Honor, a few
19    things, I have prepared two documents I will exhibit
20    to the Court as charts.
21                  THE COURT:  Uh-huh.
22                  MR. O'SULLIVAN:  First, there's a list
23    of all of the (inaudible) involved in Mr. Whatley
24    (inaudible).  The second is a chronology of events.
25    We would like the Court's permission (inaudible) to
```

Page 17

1     what happened last week.

2               The -- well, first, Mr. Whatley has been

3     examined.  In response to your question to the

4     guardian ad litem.  He was examined by his personal

5     care physician in April -- Dr. Pulmoniski (sic) or

6     something like that.  He determined he was

7     incompetent.

8               The court-appointed attorney for

9     Mr. Whatley arranged for an independent evaluation of

10    him which took place in July.  That was Dr. Kunik

11    from the Baylor Medical Center.  He determine that

12    Mr. Whatley is incompetent.

13              The court's -- a number of courts in

14    Texas have tried to advance these proceedings

15    quickly.  And it appears from the record that what

16    Mr. Shea and his client is trying to do is to avoid

17    the jurisdiction in Texas courts.

18              THE COURT:  Uh-huh.

19              MR. O'SULLIVAN:  They were all before

20    Judge Wood last Friday, the attorney for Mr. Black

21    said, Your Honor, they're hiding Mr. Whatley -- the

22    attorney for Mr. Whatley, Attorney Black, said

23    they're hiding him for me.

24              Judge Wood ordered Mr. Whatley to be

25    there with Attorney Susan Norman who's also filed an

Page 18

1   appearance, told Mr. Whatley they would appear on

2   Monday.  No one appeared, apparently, except -- I

3   mean, Attorney Norman did not appear and Mr. Whatley

4   did not appear.  Attorney Shea did.

5           Magically, somehow, they got Dr. Agris

6   to sign -- to admit him to -- or send him up to

7   Massachusetts.  It appears what they're trying to do

8   is avoid the jurisdiction of the court.

9           I talked to Attorney Black yesterday

10  morning.  He informed me that Dr. Agris was the one

11  that probably authorized him to take the flight to

12  Massachusetts.  This is before I saw this affidavit.

13  I tried to reach Dr. Agris --

14          THE COURT:  Attorney Black is the

15  attorney who's been appointed in Texas?

16          MR. O'SULLIVAN:  That's correct.

17          MR. SHEA:  Objection to the hearsay

18  nature of the testimony.

19          THE COURT:  Uh-huh.

20          MR. O'SULLIVAN:  May I have a ruling on

21  that, Your Honor?

22          THE COURT:  Overruled.

23          MR. O'SULLIVAN:  Dr. Agris refused to

24  answer my calls.  I would have liked to have talked

25  to him directly myself.  He's not returned my calls.

Page 19

```
 1                    MR. SHEA:  May I respond to the
 2      accusation in fact that there's an attempt to
 3      circuit -- to avoid the jurisdiction of the courts in
 4      Texas?
 5                    THE COURT:  Certainly.
 6                    MR. SHEA:  There is -- there indeed is a
 7      situation -- and I will make reference to the Texas
 8      record, so that anything that I say can be verified.
 9      With respect to Dr. Kunik, Dr. Kunik examined
10      Mr. Whatley in the Methodist Hospital.
11                    Dr. Kunik was told at the time that
12      Mr. Whatley was under the influence of Vicodin for
13      his hip pain and Dr. Kunik conditioned his
14      psychiatric report, saying and I quote, the fact that
15      Mr. Whatley's mental status was cardiovascular in
16      nature.
17                    This was done prior to Mr. Whatley's
18      double cardiovascular surgery, which indeed relieved,
19      as the medical records will reflect, the blockages in
20      both Mr. Whatley's arteries?  And again, I'm saying
21      this --
22                    THE COURT:  And what does that have to
23      do with avoiding jurisdiction in Texas, which it
24      appears you're trying to do?
25                    MR. SHEA:  Yes, ma'am.  Well, with
```

Page 20

```
 1    respect to Dr. Kunik, as this Court, I'm sure, would

 2    understand, Dr. Kunik then became a very critical

 3    witness with respect to the competency of

 4    Mr. Whatley.

 5              He, in fact, would be the person whose

 6    testimony would ultimately result in the deprivation

 7    of Mr. Whatley's presumption of confidence and all of

 8    his constitutional rights of freedom.

 9              Consequently, Dr. Kunik was subpoenaed

10    to appear at a temporary guardianship hearing that

11    was set by Judge Wood with less than 24 hours notice

12    to Mr. Whatley.

13              We learned of the hearing only through

14    the guardianship coordinator.  We were not given

15    notice of the hearing.  So it was fortuitous at best

16    that we learn of the pendency of that hearing, so I

17    immediately subpoenaed Dr. Kunik -- as I'm sure this

18    Court would have wanted me to do were I before this

19    Court.

20              Dr. Kunik contacted the judge and the

21    judge told him to disregard my subpoena, that he did

22    not have to appear.  And then even at the point where

23    we then determined that Judge Wood -- as he stated

24    even on the record in Houston, he intended to appoint

25    a temporary guardian absent any evidence based upon
```

Page 21

```
 1    the hearsay testimony of Dr. Kunik, which we were

 2    explicitly disallowed from cross-examining --

 3              THE COURT:  All right, sir --

 4              MR. SHEA:  -- by the trial judge.

 5              THE COURT:  -- all I'm hearing is a lot

 6    of argument.  I am not hearing anything about the

 7    accusation that you were attempting to avoid Texas

 8    jurisdiction, which I believe has a lot of merit.

 9              MR. SHEA:  We -- we are legally using

10    all available means to -- to avoid what I will

11    characterize as the judicial tyranny of the Honorable

12    Mike Wood in Probate Court No. 2 of Harris County,

13    Texas.

14              And I am obligated as an attorney in

15    both this Commonwealth and in Texas to stand up to

16    that kind of conduct.  That is precisely what we are

17    doing.

18              THE COURT:  You can't do that by fleeing

19    the jurisdiction, sir.

20              MR. SHEA:  We did not flee the

21    jurisdiction, Your Honor.  Mr. Whatley was under no

22    orders that would have prevented him from doing

23    anything.  He was following the advice of Dr. Agris's

24    testimony as in the affidavit admitted in this case.

25              THE COURT:  All right.  Mr. O'Sullivan?
```

Page 22

```
 1                MR. O'SULLIVAN:  I have nothing further

 2    to add.

 3                THE COURT:  And what is it you're

 4    seeking today?

 5                MR. O'SULLIVAN:  At the very least, Your

 6    Honor, I would like to keep the current order in

 7    place.  Given the conflict, I think he should be

 8    evaluated.  The (inaudible) staff is fully equipped

 9    and able to do that.  He should be held until the

10    Texas court can conduct its hearing next Thursday.

11    And if a temporary guardian is appointed, then the

12    temporary guardian can come up and get him.

13                If the temporary guardianship is denied,

14    then I suppose I would dismiss my petition.

15                THE COURT:  The one in Texas, is what

16    you're saying?

17                MR. O'SULLIVAN:  Yes, that's correct.

18                THE COURT:  Well, so you're saying have

19    him evaluated here for purposes of the Texas hearing?

20                MR. O'SULLIVAN:  Well, no, not

21    necessarily, Your Honor.  I guess what I'm responding

22    to is Mr. Shea's -- he's pointed out correctly that

23    when Dr. Kunik evaluated him in July, Dr. Kunik said

24    that Mr. Whatley's medical condition may be somehow

25    compromising his competence.
```

```
 1                    If his medical condition has stabilized,
 2      then he should be re-evaluated.  That could be done
 3      now.
 4                    But we do have an order signed by the
 5      court on Wednesday that says he's to stay here until
 6      further hearing, until there's a hearing on the
 7      merits.  That has not happen yet.  I don't see the
 8      need for Massachusetts to actually conduct a trial
 9      when there's a hearing pending within a week.
10                    I think he should be held in
11      Massachusetts, he should stay at Beth Israel Hospital
12      until we hear from the court in Texas.
13                    MR. SHEA:  May I respond to that, Your
14      Honor?
15                    THE COURT:  Yes.
16                    MR. SHEA:  Your Honor, Mr. Whatley --
17      the medical records will reflect is a Type II
18      diabetic as stated by Dr. Agris.  This case has been
19      replete with accusations that elder abuse is being
20      hoisted somehow upon Mr. Whatley.
21                    Mr. Whatley has been the recipient of
22      some of the finest world-class medical care that can
23      possibly be made available to anyone in this country.
24                    Indeed, the very reason he is in Boston
25      is because of the fact that since he's a diabetic and
```

Page 24

```
 1   has problems associated with that, he's at Beth

 2   Israel Hospital which is affiliated with the Jocelyn

 3   Diabetes Clinic.

 4            Now, I could see that the Court would be

 5   concerned if we had brought Mr. Whatley to Boston to

 6   go to the, if you'll pardon the expression, East

 7   Overshoe off-campus medical laboratory which is not

 8   licensed by the Commonwealth of Massachusetts.

 9            He's here because he wants to be here,

10   Judge.  So I'm representing the Whatley's have

11   absolutely no intention of leaving Beth Israel until

12   appropriate medical work is done on him as requested

13   by Dr. Agris and his communication with Dr. --

14   (inaudible).

15            I will again indicate that I believe it

16   is a bit outrageous -- as a matter of fact, even an

17   insult to Beth Israel Hospital to imply that somehow

18   bringing a diabetic to Jocelyn Clinic is somehow

19   elder abuse.  I find that preposterous.

20            THE COURT:  That is certainly not the

21   allegation.  The allegation is that he is being kept

22   from the Texas courts and that perhaps he is being

23   used financially exploited, Mr. Shea.

24            And to do that, it appears that medical

25   facilities are being used.
```

Page 25

```
 1              MR. RODRIGUEZ:  Your Honor --

 2              THE COURT:  Mr. Rodriguez?

 3              MR. RODRIGUEZ:  I do have the

 4   clinical -- a copy of the clinical records of the

 5   blood sugars test that have been taken on

 6   Mr. Whatley, both on the date he arrived through

 7   yesterday.

 8              And when he arrived, his blood -- his

 9   finger stick was a 161, which was within the range

10   for his condition.  It spiked a little bit a couple

11   hours later.

12              THE COURT:  Uh-huh.

13              MR. RODRIGUEZ:  The hospital indicated

14   they didn't know when he had his insulin, so they --

15   that wasn't too surprising.  And it's been completely

16   stable all week.  The hospital's position is that

17   they will, if there's an order, obviously Mr. Whatley

18   can stay, but otherwise they would have discharged

19   him yesterday.

20              THE COURT:  Yes.

21              MR. SHEA:  Your Honor, may I ask that if

22   the document that has been submitted to the Court is

23   being offered as an exhibit?  There is a list of

24   various items, I believe, that Mr. O'Sullivan has

25   tendered to the court.  I strenuously object to those
```

Page 26

```
 1   as --

 2                 THE COURT:  He -- he --

 3                 MR. O'SULLIVAN:  I offered it as a

 4    chart.

 5                 THE COURT:  He offered it as a chart.

 6                 MR. SHEA:  But it does -- it does

 7    contain conclusions and statements which are --

 8                 THE COURT:  Chart, sir.  It's to assist

 9    in following the testimony -- or actually the

10    argument, since it's not testimony.  None of the --

11    the only person who gave any testimony here is

12    Mr. Rodriguez.

13                 My orders of September 14th, 2005, shall

14    remain in full force and affect pending a ruling from

15    either the Federal court or from the Texas probate

16    court.

17                 Mr. Whatley may be evaluated for

18    competency at Beth Isreal, if the Texas probate court

19    so orders or requests.

20                 Mr. Whatley shall not be removed from

21    Beth Isreal Hospital without court order.

22                 The hearing in Texas on September 22nd,

23    2005, shall go forward as schedule.

24                 If the Texas court so orders,

25    Mr. Whatley shall be returned to Texas.
```

Page 27

1                          That is my order.

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IN THE MATTER OF PERRY LEE WHATLEY

Page 28

```
 1                 Commonwealth of Massachusetts
 2                      The Trial Court
 3              Probate and Family Court Department
 4              In the matter of:  Perry Lee Whatley
 5                    Docket No. 05-P-2003
 6
 7                 I certify that the foregoing is a true
 8      and correct transcription, to the best of my ability,
 9      of the tape recordings of the proceedings held as
10      provided to me by the Commonwealth of Massachusetts,
11      Trial Court, Probate and Family Court Department,
12      Suffolk Division in the above matter.
13                 I further certify that I am neither
14      counsel for, related to, nor employed by any of the
15      parties or attorneys in the action in which this
16      hearing was taken, and further that I am not
17      financially or otherwise interested in the outcome of
18      the action.
19                 I further certify that the transcription
20      fee of $150.00 was paid in full by Daniel J. Shea,
21      P.C.
22
23                 Lisa Kimball          10-11-05
24                 Transcriber           Date
25
```



HoustonChronicle.com -- http://www.HoustonChronicle.com | Section: Rick Casey

*May 28, 2005, 7:27PM*

# A $500,000 question for Judge Wood

**By RICK CASEY**
**Copyright 2005 Houston Chronicle**

ROBERT Alpert, formerly of Houston, is a very wealthy businessman.

He once paid $130,000 at his friend Andre Agassi's Las Vegas charity auction for dinner with actor Robin Williams.

He recently bought his mother a $600,000 Bentley GT for her 80th birthday.

And when he had two sons by women he did not marry, he set up trusts for them.

Now those trusts, and more precisely litigation that has flowed up and down Texas courts for six years, have become almost legendary among Houston's tightly knit community of probate lawyers and related professionals.



ADVERTISEMENT

Ask Jeeves

New and improved Jeeves

Search now

Search

Ask.com

It's a complicated lawsuit, with Alpert and his former lawyer, Mark Riley, hurling vicious allegations at each other. But what intrigues me is the role of the arbiter of the case, veteran probate Judge Mike Wood.

## The IRS bounty deal

Riley was a lawyer working for Alpert. After a succession of trustees resigned, Riley became trustee of several trusts that Alpert set up for his two sons.

Later, Alpert and Riley had a falling-out, and Alpert says he fired him. But Riley kept acting as trustee of the trusts.

In 1999, Riley filed a suit accusing Alpert of interfering with his work as independent trustee and of fraudulently using the trusts as a tax dodge.

Alpert denies the allegation, saying that he engaged in certain stock transactions involving the trust only after getting Riley's opinion that they were legal. Riley denies this.

A jury now sitting in Wood's court will sort out the truth in this matter, but there's a whole other side of the story that the jury may never get to hear.

It appears that in 2000 Riley hired a lawyer to negotiate a bounty deal with the Internal Revenue Service Criminal Investigation Division. He would provide evidence of tax fraud by Alpert in exchange for a substantial reward.

Lawyers I talked with winced at a lawyer turning in a former client but were appalled at a deal in which he would profit from doing so.

But the issue for this lawsuit is that if the sons had a reasonable expectation that their father would continue to contribute to the trust, experts tell me it could be a breach of fiduciary duty for the trustee to work to put their father in prison. If he was going to be a snitch for the IRS, he should resign as trustee.

A businessman for whom Riley later worked, Robert Hux, gave an affidavit saying Riley openly bragged about his deal with the IRS.

Hux also produced a draft copy of an alleged agreement with the IRS paying Riley 15 percent, up to $7.5 million, of any penalties, fines and back taxes his information produced.

But Judge Wood has ruled that Hux's disclosure was a violation of a secrecy agreement reached in a separate lawsuit between Riley and Hux and was inadmissible.

Early this week, before impaneling a jury, Wood said in court he might let Alpert's lawyers question Riley about the agreement. But the next morning Wood met alone in his chambers with Robert Scardino, the lawyer who represented Riley in negotiating the deal with the IRS. Scardino had been asked to bring a copy of the signed agreement.

Judge Wood came out and announced that Scardino told him, based on federal law, that Scardino could go to prison for turning over the document. The signed document, said Wood, was "the best evidence" regarding the agreement, but he was not going to order Scardino to possibly commit a crime by producing it.

He then said if Alpert's lawyers couldn't produce this "best evidence," they were not entitled to raise the issue at all.

Pressed by Bobby Bayless, one of Alpert's attorneys, Judge Wood later gave the federal laws Scardino cited.

One was Federal Rule of Criminal Procedure No. 6, regarding federal grand juries. But the section regarding secrecy says clearly, "No obligation of secrecy may be imposed on any person except in accordance with" the next section, which is a list of those covered by secrecy. It includes the grand jurors, the court reporter, the government attorneys and others working for the government.

The other was Section 6103 of the IRS Code, but it has to do with the confidentiality of tax returns and is also aimed at government employees.

Meanwhile, in a February hearing in a related federal lawsuit, Assistant U.S. Attorney Al Balboni made two statements of interest.

The first was that a federal grand jury proceeding regarding Alpert has ended, and there is no ongoing investigation. The feds decided not to press charges.

The second: The fact that there was a grand jury investigation does not make documents provided to the grand jury secret.

The judge asked if what he "was saying is that you would not view it as a problem if information was sought to be discovered (that) had also been provided to the grand jury?"

"That's right, your honor," Balboni said.

So there may well be no law barring Riley's contract with the IRS from being made public. I don't know if that would get Alpert off the hook for anything he may have done. But I do know this:

Judge Wood has awarded nearly $500,000 in fees to be paid by the trust (in other words, the sons) to Riley's lawyers. If Riley is found to have breached his fiduciary duty to the trust, the trust cannot be made to pay for his lawyers.

They could be made to pay the money back to the trust and try to collect from Riley.

Those lawyers happen to be with Judge Wood's former law firm, Crain Caton & James. Wood left it many years ago, and the law doesn't require him to recuse himself — something that Alpert twice tried to force.

But Wood's zeal to keep the jury from knowing about Riley's alleged agreement with the IRS does make you wonder.

*You can write to Rick Casey at P.O. Box 4260, Houston, TX 77210, or e-mail him at rick.casey@chron.com.*

---

HoustonChronicle.com -- http://www.HoustonChronicle.com | Section: Rick Casey
This article is: http://www.chron.com/cs/CDA/ssistory.mpl/metropolitan/casey/3201825